IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO.: 5:25CR70 |
| | ) |
| Plaintiff, | ) JUDGE DONALD C. NUGENT |
| | ) |
| v. | ) |
| | ) |
| VAL ILIEV, | ) SENTENCING MEMORANDUM |
| VALLMAR STUDIOS, LLC, | ) |
| | ) |
| Defendants. | ) |

Now comes the United States of America, by its counsel, Carol M. Skutnik, Acting United States Attorney, Duncan T. Brown, Assistant United States Attorney, and hereby submits this Sentencing Memorandum, and respectfully requests this Court sentence defendant VAL ILIEV to a term of incarceration of 66 months and restitution in the amount of $5,248,007.39 for the reasons argued below.  The government requests VALLMAR STUDIOS be sentenced pursuant to its plea agreement.

**I.     FACTUAL BACKGROUND AND CLARIFICATIONS**

The government has reviewed the statement of facts contained in the Pre-Sentence Reports (PSR) for both Val ILIEV and VALLMAR STUDIOS, LLC, hereinafter collectively referred to as "the Defendants," unless specifically identified individually.  The government agrees with the statement of facts contained in the PSR; however, it provides additional facts and background to address specific objections raised by the Defendants in their objections.

**A.     The Defendant's Knowledge of the Ballistic Plates' Substandard Quality Was Evident Through How The Plates Were Smuggled Into the United States**

Simply, the Defendants used a sophisticated shipping technique to avoid detection by Customs Agents; the Defendants were not the victims of circumstance, they were operating a

1

business that relied on intentional acts to deceive and evade. At the direction of the Defendants, Chinese manufacturers and brokers sent plates to three locations in order to minimize the likelihood of detection, and in their communications with Chinese manufacturers and shippers, the Defendants exhibited full knowledge and control over every step of the process.

In May 2023, a Canadian registered commercial truck and trailer entered the United States from Canada at the Blaine, Washington, Commercial Port of Entry (POE). The truck was carrying over 200 unlabeled/unmarked hard polyurethane ballistic body armor plates packaged in boxes that originated from the People's Republic of China. A full inspection of the body armor found no markings that indicated origin or manufacturer.

The UPS shipping label associated with the boxes contained the following information. Tracking number: "1Z5860360316572259", shipper/return address of "HUANG, Si 1604 Cactus Road, San Diego CA USA 92154," and the recipient/final consignee as, "VALLMAR, 1100 Campus Drive # 200 Stow OH USA 44224."[1]

The Defendants received shipments at their personal home (Exhibit 1) as well as Vallmar Studios (Exhibit 2) and ShotStop (Exhibit 3). This, however, should not suggest that such shipments were based on convenience or expedience; rather, the deliveries were deliberate and consistent with larger scheme to conceal and defraud. As charged, the Defendants relied on the appearance that their ballistic plates were made in the United States to NIJ standards – this was a fraud ShotStop repeatedly touted to potential customers and was used in materials presented to

---

[1] Placing pre-packaged and pre-labeled boxes containing contraband within a larger container is a technique known as "Master Carton Smuggling." Master Carton Smuggling is when master cartons (full containers) are used to conceal items (e.g., contraband, narcotics, etc.) in smaller packages contained within. The smaller packages are pre-affixed with domestic labels and are introduced into the domestic commerce stream once deconsolidated. These packages go either un-manifested or mis-manifested.

lure in potential investors. While the Defendants relied on the construct that ShotStop "purchased" plates produced by Vallmar Studios, in reality, after receiving plates from China, Vallmar Studios merely "sold" those same plates to ShotStop via purchase order and invoice sent from one side of the warehouse to the other. (Exhibits 3a-3c) Rather than Vallmar Studios actually producing anything for sale, the invoices were illusory and served no other purpose than to add one step of obfuscation between the overseas manufacturers and the end consumers. Regardless of whether plates were sent to the Defendant's home, Vallmar Studios or ShotStop, all manufacturing occurred in China at the direction and specifications of ILIEV.

Thus, the initial act of how the plates entered the country provides compelling context that the Defendants were not merely victims of circumstance, taken advantage of by brokers who directed everything from afar. Indeed, the Defendants were in regular contact with the Chinese manufacturers and brokers detailing everything from the finish of the products to where the items were ultimately received. (See Exhibits 4-18). Moreover, the steps the Defendants took once the plates were in their possession demonstrate that they deliberately concealed their true origin. ILIEV hoped to create the illusion that the items traveled in legitimate commerce through false internal invoices between Vallmar and ShotShop.

B. There Simply Was No Compliance With NIJ Standards

Despite the Defendants' claim in their objections that certain Chinese factories were NIJ approved, and labels were printed on "NIJ approved printing devices," there was nothing in compliance with the NIJ approved manufacturing processes as submitted by Vallmar and ShotStop.[2]

---

[2] The National Institutes of Justice, (NIJ), is a component office of the Department of Justice, which reviews tests performed by certified laboratories and certifies the functionality of body

Simply, there are no NIJ-approved Chinese manufacturers of the finished ballistic plates as sold by the Defendant, all NIJ approved manufactures are based in the United States.  Nor did the Defendant's NIJ certifications seek approval for processes Chinese manufacturers, all of their submissions detailed manufacturing in Stow, Ohio.  While component parts of ballistic plates are made in various nations around the world, the NIJ certification examines the manufacturing and assembly of those parts.  In the case of the Defendants, NIJ certification was granted based on representations that manufacturing was done in Stow, Ohio at the Vallmar and ShotStop plants.  As the photographs attached demonstrate, neither Vallmar Studios nor ShotStop were capable of manufacturing *anything*.  (Exhibits 19-24: Vallmar; Exhibit 25-29: ShotStop).  Both locations contained only offices and shipment facilities, in direct opposition to the Defendant's representation to the NIJ or stated on their own labels as "Made in Stow, Ohio."  (Exhibits 30-31).

Moreover, there is no such device as an "NIJ approved printing device." The printer used by the Defendants was a commercial device, (Exhibit 32), and the NIJ does not rate the ballistic value of any label[3].  The NIJ does, however, protect its name, seal, and certifications with

---

armor. Body armor is certified at various levels through a standardized and controlled process during which rounds of ammunition are fired at preset standard distances.

If body armor meets the standards for certification, the manufacturer and distributor are permitted to use a trademarked symbol and approved description of the level of certification on the product.  Moreover, that certification covers the manufacturing process provided by the manufacturer and distributor.  Therefore, certification is dependent on two factors 1) approval of specific and precise manufacturing methods submitted to the NIJ by the certification holder, and 2) satisfactory testing proof that those manufacturing standards meet NIJ performance standards.  Only products certified through NIJ review and testing may use the NIJ certification symbols, and the products can only state they are certified for those tests they have passed. The Defendants failed in both regards; despite being approved for specific manufacturing processes, neither ILIEV, Vallmar Studios or ShotStop Ballistics followed those procedures, nor did their final product pass NIJ testing thresholds.

[3] The government does draw the Court's attention to the three-monkey figurine in front of the

4

trademarks, service marks and other intellectual property protections. By fraudulently affixing NIJ labels, certifications and marks on its items, the Defendants clearly violated 18 USC § 2320.

### C. ILIEV Knew His Product Did Not Meet NIJ Standards

The government disagrees with the objection that ILIEV was not aware that he was selling substandard body armor.[4] The government has attached its own testing of ShotStop plates as well as limited testing paid for by the Defendants in and around 2017 and 2018. The government avers 1) the number and procedure of testing paid for by the Defendants did not meet minimum standards, 2) the amount of deformation exceeded limits, and 3) there was no testing by the Defendants after approximately 2018. (Exhibits 33-34: government testing, Exhibits 35-39: 2017 Defendants testing).

Undaunted, in his advertising ILIEV touted proper NIJ certification and domestic production as selling points, knowing those to be untrue. ShotStop Ballistics not only advertised,

---

printer. This statue is of three monkeys in the "hear no evil, see no evil, speak no evil" pose. These monkey statues were placed throughout the ShotStop offices and warehouse to encourage silence surrounding ILIEV's business practices.

[4] Indeed, even on page 7, paragraph 14 of the PSR, ILIEV admits this very fact his objection letter now challenges. The government recognizes ILIEV's right to allocate for himself and on his behalf, however, he cannot use allocution as a sword and his plea agreement as a shield. The greater he asserts this belief, as is his right, the government is ready to provide the following pieces of evidence recovered from the Defendant's offices to disprove that assertion, as is its right under the terms of the plea agreement, and, in doing so, the government reserves the right to exercise its discretion in recommending full consideration for acceptance of responsibility and other considerations related to ongoing cooperation and acceptance of guilt. Specifically, the government will be prepared to play sections of a corporate meeting held on or about July 15, 2019, where ILIEV responds "F--k no" to questions from salesmen regarding if the products are made outside the United States, and responds in a similar manner on further questions about overseas manufacturing. The recording contains other statements including ILIEV stating that "Vallmar is responsible because the producer is not legally allowed to produce," and they are "f---king up" quality standards for pursuing Department of Defense contracts.

5

but also sold exclusively through online, Internet sales, using the interstate functionality of the Internet to sell counterfeit body armor worldwide.

## II.     DETERMINING THE ADJUSTED OFFENSE LEVEL

The government agrees that an Adjusted Offense Level of 27 is appropriate and consistent with the Plea Agreement, even though it applied an additional increase for conscious or reckless risk of death or serious injury, which was negated by the Zero-Point Offender reduction. The government would, depending on its arguments above, recognize the final Adjusted Offense level would be **26, Criminal History I: 63-78.** Because the only issue is whether an additional decrease, not included in the Plea Agreement, and within the discretion of the Court, is warranted, that will be the only argument addressed by the government.

### A.     Application of Zero-Point Offender reduction

USSG §4C1.1(a)(1-11) set forth ten criteria to determine if the Defendants qualify for a zero-point offender reduction of two levels. The government agrees that ILIEV had zero Criminal History points and other than "(4) an offense resulting in death or serious bodily injury," no other subparagraphs could apply. While, fortunately, the government cannot point to a recorded death or serious bodily injury sustained to U.S.-based law enforcement while wearing ShotStop plates, the issue becomes more complicated by the Defendant's own actions. As shown in Exhibit 40, in 2022, the Defendants sent, with media fanfare, ShotStop plates to Ukraine to be used by soldiers fighting Russian forces. The plates sent to Ukrainian forces did not meet Level IV testing, the required plate stopping a 7.62x39 round, as advertised and indicated by the plate labels.[5]

---

[5] Without indulging in further ballistic analysis, the government is aware that Russian forces were at times using a more advanced 7.62x39 rounds with a higher pressure at combustion, which would make them travel at a higher velocity, calling into question the efficacy of standard Level IV plates, let alone the substandard ShotStop plates fraudulently labeled as Level IV.

To date, agents of Homeland Security Investigations have not been able to track the receipt of ShotStop plates within Ukraine or the use of those plates on the battlefield. However, tragically, the government does not naively believe that the same ballistic plates that completely failed domestic testing would protect soldiers in the field of battle. Simply, ILIEV was driven by profit, he made a substandard product and tried to sell it to law enforcement as something it could never be.

The contradiction inherent in the ILIEV's positions in the PSR and objection letter is that it creates an irreconcilable position that leads to the same result. According to the plea agreement, ILIEV's Adjusted Offense Level is **26**. Likewise, in the PSR, ILIEV is also a **26** because, although two levels are awarded for recklessly creating a condition that could lead to death or serious injury, it is negated by the zero-offender departure for not actually resulting in death or serious injury.[6]

However, should ILIEV's position in his letter be adopted, he would have this Court believe that he couldn't have created a reckless condition because he didn't know his ballistic plates were substandard. Thus, with no two-level increase, he would benefit from the zero-point reduction to make him an Adjusted Level **24**. Therein lies the rub, were the Court to adopt this argument by ILIEV, there would remain, at a minimum an opposing admission of guilt and acceptance of responsibility made by ILIEV in the PSR. Thus, the government would be forced to give the PSR statement full faith and credit and withdraw its points for acceptance and other departures, revising his Adjusted Offense Level back to **26**.

---

[6] The Adjusted Offense Level 26 includes a one level reduction contemplated within ILIEV's plea agreement not otherwise calculated in the PSR and dependent upon the discretion of the government to move for from the Court.

7

### III. WHEN THE GUIDELINE CALCULATIONS ARE CONSIDERED WITH THE 3553(a) FACTORS, THE GOVERNMENT REQUESTS A TERM OF INCARCERATION OF 66 MONTHS

The government is recommending a term of imprisonment of **66** months, the low end of the 63 to 78 month range calculated herein, but not the absolute bottom.  Equitably, were this Court to adopt an Adjusted Offense Level **24** despite the government's withdrawal of additional departures for adversarial acceptance of responsibility, the top of level 24 is 63 months, which is consistent with the government's position.

While a lengthy period of incarceration, such a sentence is warranted given the duration of the scheme, the sophistication of the smuggling, and the danger in which the Defendants placed unwitting law enforcement while doing their jobs protecting society.  Moreover, a sentence within Zone D is appropriate because a term of community release would result in Defendant facing essentially no consequences for his criminal conduct.

The sentencing court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2), including "the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

In fashioning a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in Section 3553(a)(2), the Court must also consider: "the nature and circumstances of the offense and the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1); "the kinds of sentence and the sentencing range established for . . . the applicable

8

category of offense committed by the applicable category of defendant as set forth in the guidelines" under 18 U.S.C. § 3553(a)(4)(A); "any pertinent policy statement . . . issued by the Sentencing Commission . . . " under 18 U.S.C. 3553(a)(5)(A); and "the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct . . . ." under 18 U.S.C. § 3553(a)(6).

While it is not necessary for the district court to "engage in a ritualistic incantation of the § 3553(a) factors, "its reasoning should be "sufficiently detailed to reflect the considerations listed in § 3553(a) and to allow for meaningful appellate review." *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (internal quotations and citation omitted).  Simply stated, a sentencing judge is not required to "expressly state each of these factors at sentencing." *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008).  However, if the district court determines that "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is *sufficiently compelling* to support the degree of the variance."  *United States v. Erpenbeck*, 532 F.3d 423, 437 (6th Cir. 2008) (*quoting United States v. Gall*, 128 S. Ct. 558, 597) (2007) (emphasis added).  A variance "based on a policy disagreement with the Guidelines . . . may be entitled to less respect" and be "suspect" on appeal.  *Spears v. United States*, 128 S.Ct. 586, 599 (2007); *see United States v. Herrera-Zuniga*, 571 F.3d 572, 585-86 (6th Cir. 2009).

### A. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense Supports a Term of Imprisonment

The Defendant in this case deserves to receive a sentence that promotes a respect for the law, a respect that he simply does not exhibit.  While his offices were festooned with military insignia, police patches and patriotic symbols, ILIEV was motivated solely by profit.  (Exhibits 41-43).  Plainly, his actions were crass and callous and should not be minimized by the sheer stroke

9

of luck his products did not fail while being worn by law enforcement to the government's knowledge.

While five- and one-half years is a significant term of incarceration, it reflects the length of time he imported ballistic plates from China. Just as he wrapped his business in the American flag to promote his business among men and women in uniform, he must now admit that any term of incarceration pales in comparison to lifetime of suffering that these plates could have inflicted on those same clients.

      **B.**      **The Need for the Sentence to Afford Adequate Deterrence**

This case, at this time, speaks to a larger need for deterrence beyond merely a message sent to the Defendant. The economy, despite showing some signs of life, remains burdened by lingering high inflation, meaningful employment remains elusive to many members of society, and there is a malaise across society about the integrity of our institutions. The Defendant's actions, tragically, feed into all of these ills. Driven by his own greed and avarice, he defrauded men and women taking an oath to protect society and uphold its ideals.

Without hesitation, the government argues that a sentence of 66 months incarceration is appropriate pursuant to §3553a because it sends a clarion message that the government will protect law enforcement in the line of fire from predatory forces looking only to make a profit. It reassures its citizenry that despite the tough economic times that currently exist, and as storm clouds continue to amass on the world stage, now is the time to support those who answer the call to duty here and abroad, and send a stern message that those who cloak themselves in the institutions of law enforcement and military service only to betray those ideals will not be tolerated.

**IV.     RESTITUTION IN THE AMOUNT OF $5,248,007.39 IS REQUIRED**

Pursuant to the Mandatory Victim Restitution Act of 1996, a restitution amount totaling $5,248,007.39 is a calculatable amount and the victims, listed in the attached materials, are identifiable. The victims are members of law enforcement who purchased body armor from ShotStop either as a requirement for their employment, or as secondary sets of armor to be used while on duty.

Although government agencies cannot be considered "victims" for the purposes of providing victim statements for the Court's consideration, it is entirely reasonable and proper for such individuals and entities to seek restitution to be returned to whole after the Defendant and ShotStop's fraud and misrepresentations have been exposed. In the instant case, such restitution is even more urgently needed because the Defendants' criminal conduct not only put at risk those who purchased and wore the faulty body armor, by profiting from government grants and budgets, the Defendants again victimize those at risk by making them spend funds a second time to buy from reputable vendors. Simply, because of the Defendant's greed and lack of concern for ensuring his product performed to the required standards, he should be held financially accountable to his potential victims as well.

**V.     CONCLUSION**

By committing the fraud scheme for which he is convicted, and in the manner in which he committed it, this Defendant has violated the trust of his community, the trust of his law enforcement clientele, and the trust of those he donated body armor to on the front lines of conflicts around the globe. He must be punished for his continued lies and frauds, from which not only he profited, but he did so with little to no regard for those lives he endangered. Despite his attempts to claim he believed the smuggled plates were in compliance with NIJ standards, the Defendant also acknowledged that he never properly tested any plates because of personal cost to him;

11

therefore, his claims about his mistaken beliefs are as disingenuous and chimerical as the representations on ShotStop plates. That nobody could be proven to have been seriously injured, or worse – lost their lives – by mistakenly relying on his shoddy products is a silver lining, but such a lining should not be used as a shield for the consequences of his fraudulent scheme. And for that reason, a sentence of 66 months incarceration, $600 special assessment, $5,248,007.39 in restitution and 3 years supervised release is appropriate, but not greater than necessary to meet the objectives of 18 U.S.C. §3553 and the goals of punishment.

Respectfully submitted,

CAROL M. SKUTNIK
Acting United States Attorney

By: /s/ Duncan T. Brown
Duncan T. Brown (NY: 3982931)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3933
(216) 522-8355 (facsimile)
Duncan.Brown@usdoj.gov