# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:25-CR-70 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| VALL ILIEV | ) | |
| VALLMAR STUDIOS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS VALL ILIEV AND VALLMAR'S SENTENCING MEMORANDUM**

This Sentencing Memorandum for Vall Iliev and Vallmar Studios, LLC is submitted pursuant to 18 U.S.C. § 3553, Rule 32(i) of the Federal Rules of Criminal Procedure, and Rule 32.2(c) of the Local Rules of the United States District Court for the Northern District of Ohio.

Respectfully submitted,

*/s/ Mira Aftim*
John R. Mitchell (OH: 0066759)
Mira Aftim (OH: 0097754)
TAFT, STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114
P: (216) 241-2838
F: (216) 241-3707
jmitchell@taftlaw.com
maftim@taftlaw.com

*Attorneys for Defendants Vall Iliev and Vallmar Studios, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.  INTRODUCTION ...................................................................................................... 1

II.  VALL ILIEV'S BACKGROUND ............................................................................. 2

    A.  Vall's Childhood in Bulgaria ............................................................................ 2

    B.  Vall Immigrates to America ............................................................................... 2

        i.  Inception of Vallmar and ShotStop .......................................................... 3

    C.  Vall is Described as Kind, Conscientious, and Remorseful ............................... 4

III.  SENTENCING FACTORS: WHAT SHOULD THIS COURT DO WITH VALL? ........ 6

    A.  The Advisory Nature of the Guidelines ............................................................. 7

    B.  The Punishment Should Fit the Offender, Not Just the Crime ........................... 7

    C.  The Role of the Sentencing Guidelines in Sentencing Vall Iliev ....................... 8

        i.  The Nature And Circumstances of The Offense—18 U.S.S.C. § 3553(a)(1) ............................................................................................. 10

        ii.  The History and Characteristics of the Defendant—18 U.S.S.C. § 3553(a)(1). .......................................................................................... 15

        iii.  The Need For The Sentence . . . — 18 U.S.S.C. § 3553(a)(2) ................. 15

            a)  To Protect the Public and Deter Future Crime—18 U.S.S.C. § 3553(a)(2)(C) ..................................................................... 16

    D.  The Kind of Sentences Available—18 U.S.S.C. § 3553(a)(3) ........................... 20

        i.  The Sentencing Guidelines ...................................................................... 20

        ii.  Downward Departure Considering Vall's Age and Health ...................... 21

        iii.  Statistics on Excessive Incarceration ...................................................... 21

        iv.  Lower Imprisonment Range with Community Service is a Significant Sanction. .......................................................................... 22

        v.  A Sentence of Minimum Incarceration With Home Confinement .......... 23

    E.  The Need To Avoid Unwanted Sentencing Disparities Among Defendants with Similar Records—18 U.S.C. § 3553(a)(6) ........................... 24

    F.  The Need to Provide Restitution to Any Victims of the Offense ....................... 24

IV.  CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) .......................................................................... 7, 8, 9

*Kimbrough v. United States*, 128 S. Ct. 558 (2007) ................................................................ 8, 9

*Koon v. United States*, 518 U.S. 81 (1996) ................................................................................. 7

*Nelson v. United States*, 555 U.S. 350 (2009) ............................................................................ 7

*Pepper v. United States*, 562 U.S. 476 (2011) ........................................................................ 7, 9

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................... 15

*United States v. Blanton*, 1990 U.S. App. LEXIS 21544 (6th Cir. Dec. 7, 1990) ...................... 10

*United States v. Bolds*, 511 F.3d 568 (6th Cir. 2007) ................................................................. 9

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................................ 7

*United States v. Brooks*, 628 F.3d 791 (6th Cir. 2011) ............................................................... 9

*United States v. Cole*, 622 F. Supp. 2d 632 (N.D. Ohio 2008) ................................................... 9

*United States v. Coleman*, 370 F. Supp. 2d 661 (S.D. Ohio 2005) ............................................ 19

*United States v. Davey*, 433 Fed. Appx. 343 (6th Cir. 2011) ...................................................... 9

*United States v. Ferguson*, 518 Fed. Appx. 458 (6th Cir. 2013) .................................................. 9

*United States v. Foreman*, 436 F.3d 638 (6th Cir. 2006) ............................................................ 9

*United States v. Green*, 2007 U.S. Dist. LEXIS 19557 (S.D. Ohio 2007) .................................. 18

*United States v. Herrera-Zuniga*, 571 F.3d 568 (6th Cir. 2009) ................................................. 8

*United States v. Holden*, 2007 U.S. Dist. LEXIS 42722 (E.D. Mich. June 13, 2007) ................. 19

*United States v. Holz*, 118 Fed. Appx. 928 (6th Cir. 2004) ......................................................... 8

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ................................................................... 9

*United States v. Marshall*, 870 F. Supp. 2d 489 (6th Cir. 2012) ............................................... 17

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) ................................................................ 17

*United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) .......................................................... 24

*United States v. Myers*, 353 F.Supp.2d 1026 (S.D. Iowa 2005) ................................................ 23

*United States v. Myers*, 503 F.3d 676 (8th Cir. 2007) ............................................................... 24

*United States v. Sabino*, 274 F.3d 1053 (6th Cir. 2001) ............................................................ 18

*United States v. Shamilzadeh*, No. 04-CR-1094 (JG), (E.D.N.Y April 1, 2008) ........................ 23

*United States v. Smith*, 275 Fed. Appx. 184 (4th Cir. 2008) ..................................................... 17

*United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) ................................................. 17

**Statutes**

18 U.S.C. § 3553(a) ................................................................................................. 7, 24

**Other Authorities**

Dept. of Justice, Statement of Colette S. Peters (2023) ............................................... 22

DOJ OIG, The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions, (May 2023) ....................................................................................................... 21

Lindsay Mackie and John Andrews, Defector's mystery death, THE GUARDIAN, Sept. 12, 1978 . 3

Prisons Report Series, Preliminary Data Release (Dec. 2024) .................................... 21

United States Sentencing Commission, Measuring Recidivism; The Criminal History Computation of the Federal Sentencing Guidelines (2004) .................................................... 18

USSG § 5H1.1 ....................................................................................................... 21, 23

USSG § 5H1.3 ............................................................................................................. 21

USSG § 5H1.4 ............................................................................................................. 23

USSG report, The Effects of Aging on Recidivism Among Federal Offenders (2017) .............. 18

Vera Institute of Justice, Aging Out (Dec. 2017) ........................................................ 22

## I.    __INTRODUCTION__

The Court must decide what is the appropriate sentence for Vall Iliev ("Vall"), a 70-year-old non-violent offender who has never before been arrested or convicted of any crime. One who now lives in shame because of his actions and has seen his reputation irretrievably damaged in the community where he immigrated, lived, and worked. One who cannot and would not repeat his crimes because the business that he built from the ground up has filed for bankruptcy. One who has been serving an unofficial sentence of probation since 2023, and, most importantly, who has accepted responsibility for his actions and done everything possible to atone for his crimes.

Undeniably, the Presentence Investigative Report ("PSIR") captures some of the information that this Court will need to fashion a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing. But, it does not capture everything that this Court needs to know about Vall. The background into his life demonstrates that he led a career of creativity and entrepreneurship, seeking to help society with his ingenuity. He escaped the oppression of communism in his native Bulgaria, spent countless hours sacrificing himself to build his business, and he did not personally gain much of any financial benefit from his conduct.

To be clear, Vall committed the crimes to which he pled guilty. But this latest, and perhaps last, chapter of Vall's life should not end with a routine application of the sentencing guidelines. The events leading to his conviction are an unfortunate aberration from an incredible example of the immigrant experience. After an analysis of the facts of this case, the ends of justice will be readily served by sentencing Vall to a humane sentence that reflects the factors identified in 18 U.S.C. § 3553.

## II.  <u>VALL ILIEV'S BACKGROUND</u>

While the PSIR provides Vall's condensed personal and family history, his life story bears greater review.

### A.  Vall's Childhood in Bulgaria

Vall was born on April 23, 1955 in Sofia, Bulgaria. As an only child, he saw his parents divorce at the young age of seven, while growing up in a former vassal state of the Soviet Union. Despite his circumstances, Vall was motivated to attend college and graduated with a degree in mechanical and electrical engineering. He had aspirations of one day becoming an entrepreneur. Both his parents were very supportive of Vall, and taught him about personal integrity and perseverance. But he knew he had no future in Bulgaria, so he set his scope to immigrate to America—the land of opportunity. However, the decision to leave his family and friends behind in Bulgaria to start a better life in America was a very bittersweet moment for Vall. To this day, he suffers trauma and anxiety from this decision.

### B.  Vall Immigrates to America

In 1976, during the Cold War, Vall arrived in America as 21-year old political immigrant, escaping the communist party and hopeful to finally live a safe, free life. After escaping Bulgaria, he was declared a "nonperson" by the Bulgarian government and all his vital records were destroyed in an attempt to erase his existence. Vall was placed on a governmental list for paid assassins, seen as an enemy of the state for escaping the totalitarian regime. He learned that his family and friends were interrogated by the KGB in an attempt to obtain information about Vall's

whereabouts. Later, he also learned his good friend was assassinated in London for leaving communist Bulgaria.[1]

Despite all odds, Vall attempted to put aside his troubles and persevere. He was in America, the land of opportunity, and he wanted to pay back the country that offered him a better life. In 1988, Vall became a U.S. citizen and participated in engineering and novel technology trade organizations such as SME, ASTM, and USPTO to learn how he could utilize his skills to benefit society. In 1995, following the fall of communism, Vall visited Bulgaria and met his current wife, Pepa Iliev. The following year, the two were wed, and Pepa moved to the United States with Vall where they started their new family.

### i. *Inception of Vallmar and ShotStop*

When Vall first arrived in America, he worked for Ferriot Brothers, Inc., a custom injection molder and contract manufacturer in Akron, Ohio. He was eager to work and learn about the parameters of the free market economy.

In 1984, Vall founded Vallmar Studios, LLC ("Vallmar"), focusing on business consulting services and product development for individual inventors. In 2008, Vall incorporated Vallmar and routinely worked 60-80 hour weeks. Vall was constantly focused on his business and creating new patents.

In 2015, Vall founded ShotStop Ballistics LLC ("ShotStop") which focused on providing lifesaving ballistics technologies for law enforcement and other customers. Vall used ShotStop to create a body armor with his patent technology as a way to give back to those he respected the most. With another company under his name, Vall's dedication to his work only intensified. When

---

[1] *See* Lindsay Mackie and John Andrews, <u>Defector's mystery death</u>, THE GUARDIAN, Sept. 12, 1978, available at https://www.theguardian.com/world/from-the-archive-blog/2020/sep/09/georgi-markov-killed-poisoned-umbrella-london-1978.

Vall was not working, he spent his remaining time attending trade seminars, researching industry issues, and trying to create new innovative products. Pepa writes, "He works hard and works long hours, 365 days of the year. Vacation, celebrations, and holidays do not exist for Vall Iliev and his family."[2] At its peak, ShotStop had approximately 10 full-time employees and over 100 small investors.

Vall became a well-known and trusted professional in the ballistics field. Not only did he have trusted customers, but he also became good friends with the law enforcement he sought to protect. But, because of this case and other civil cases, ShotStop is currently undergoing bankruptcy proceedings. Yet, Vall is still trying to better society by inventing new patents and technology by researching health care solutions.

This Court has seen Vall's current finances in the PSIR, however those finances are not accurately portrayed. As further explained below in Section III(C)(i), Vall's business was not a success. Despite his decades of hard work, his businesses did not translate into the financial security he hoped for him and his family. To the contrary, Vall has no businesses, no retirement fund, and is barely surviving financially.

### C.     Vall is Described as Kind, Conscientious, and Remorseful

Throughout his career, Vall has made an impact on those with which he crossed paths. This is clear from the all the character letters submitted on his behalf by:

**Former Deputy Sheriff**: Paul Larkin, who was in the ballistic materials market for the last 26 years, writes, "I have struggled both personally and professionally about writing this character letter on behalf of Val, but after praying about it, God is telling me to act on what is right . . . I can say without hesitation that [Vall] is a good man who has made a mistake and one that I feel he

---

[2] Exhibit A, p. 1.

deeply regrets and takes full responsibility for." "[Vall] has consistently demonstrated kindness, humility and a willingness to help others."[3]

**Attorneys**: John D. Gugliotta who has known Vall for over 20 years, writes "With pride, [Vall] built a business that aimed to protect lives through ShotStop Ballistics LLC, and appeared to be truly consumed with doing the best for all stakeholders: shareholders, employees, and customers alike."[4] While acknowledging the severity of the charges against Vall, he states "I sincerely believe that Vall found himself overwhelmed and 'in over his head' in this situation."[5] He describes Vall as "a person, who despite his mistakes, strives to do right."[6]

Jason Kee has known Vall for more than 16 years, and writes "I have witnessed Vall's kindness and compassion for others. Whether it has been his patience in working with difficult clients, his honesty in dealing with vendors, or his thoughtfulness of others when working through disputes. I have never known Vall to be anything other than a [*sic*] warm, generous and altruistic." "The products that he produces have always been of the highest quality and he does a thorough job of reviewing and making sure that his designs are safe." "I believe that this incident is not reflective of [Vall's] true nature or character."[7]

**Spouse**: Pepa Iliev, who has known Vall for over 28 years, describes Vall's one mission in life as serving others unconditionally.[8] Aside from creating over 100 of his own patents, Vall

---

[3] Correspondence of Paul Larkin, attached as Exhibit B.

[4] Correspondence of John D. Gugliotta, attached as Exhibit C.

[5] *Id.*

[6] *Id.*

[7] Correspondence of Jason P. Kee, attached as Exhibit D.

[8] Correspondence of Pepa Iliev, attached as Exhibit A.

helped hundreds of like-minded "entrepreneurs improve their ideas and products."[9] She describes Vall as having a "trusting personality" which "gave opportunity to others to use him in any way they can."[10]

**CPA**: J. Thaddeus Kee has known Vall for over 20 years, and writes, "[Vall's] honesty and accountability are qualities that I admire. . . I know that there were many business decisions that Vall made that he would admit were made in error, but none of what has happened had a self-serving motive."[11]

The 5 character letters attached hereto come from those who know Vall best and can see through the negative media now surrounding him. While many are disappointed in his actions that led to this case, they stand by Vall and are adamant that this was out of character for him. It is clear that Vall's efforts to help others have been long-standing and heartfelt, and stem from a commitment to improving society.

## III.    SENTENCING FACTORS: WHAT SHOULD THIS COURT DO WITH VALL?

A less than guidelines sentence takes into account Vall's age and serious medical conditions. Respectfully, and in accordance with Sixth Circuit precedent, we suggest that an application of the sentencing factors contained in 18 U.S.C. § 3553 will enable this Court to fashion a humane sentence that, due to Vall's circumstances, is sufficient, but not greater than necessary, to punish him.

---

[9] *Id.*

[10] *Id.*

[11] Correspondence of J. Thaddeus Kee, attached as Exhibit E.

### A. The Advisory Nature of the Guidelines

As the Court knows, in the Post-*Booker* era, the sentencing guidelines are not only no longer mandatory, but they are also not presumed to be reasonable. *United States v. Booker*, 543 U.S. 220, 264 (2005); *Nelson v. United States*, 555 U.S. 350, 351-52 (2009). Instead, the guidelines remain a "starting point" and "the initial benchmark" for this Court to consider when fashioning an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). The *Gall* Court directed the sentencing judge to "consider all of the § 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. *Id.* at 39; 18 U.S.C. § 3553(a). As the Supreme Court has made clear, no "extraordinary circumstances" are required to support a variance from the advisory Guidelines range. *Gall*, 552 U.S. at 47. Rather, the sentencing court "must make an individualized assessment based on the facts presented" to determine a sentence sufficient, but not greater than necessary to achieve the goals of sentencing. *Id.* at 50.

### B. The Punishment Should Fit the Offender, Not Just the Crime

The United States Supreme Court has held that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). It has also determined that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

There is no question that this Court has gained significant insight into Vall from the PSIR, the statements and information above and the letters from those who know him best, and the importance of this information cannot be overstated. This information was offered because the

Sixth Circuit has acknowledged that, although correlated with socio-economic status, a defendant's educational and vocational skills, age, employment record, military, civic, charitable, public service, and employment related contributions, and prior good works are permissible factors for a district court to consider when determining the appropriate individualized sentence for a defendant. *See United States v. Holz*, 118 Fed. Appx. 928, 935 (6th Cir. 2004).

Whether a sentence is reasonable now is determined not only by the actual sentence itself, but also by the process that the court used to decide upon that sentence. *See Gall v. United States*, 552 U.S. 38, at 51 (2007) (holding criminal sentences must be both procedurally and substantively reasonable). In addressing the benchmark for procedural reasonableness, the Sixth Circuit stated:

> In order for a defendant's sentence to be procedurally reasonable, the district court cannot presume that the sentencing range recommended under the Guidelines is mandatory or even reasonable . . . Instead, the sentencing court must 'make an individualized assessment [of the appropriate sentence] based on the facts presented.' In making that determination, the sentencing judge is obligated to consider the unique circumstances of the defendant's case in light of the factors set out by Congress in 18 U.S.C. § 3553(a).

*United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009) (internal citations omitted).

## C.    The Role of the Sentencing Guidelines in Sentencing Vall Iliev

With the United States Sentencing Guidelines now rendered "advisory only," *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007), a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. *United States v. Herrera-Zuniga*, 571 F.3d 568, 585 (6th Cir. 2009) ("The Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the

grounds that can justify a non-Guidelines sentence.") (quoting *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008)). While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration . . ." *Gall*, 552 U.S. at 49; *see also Kimbrough*, 128 S. Ct. at 564 ("[T]he Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."). A district court may now vary from the applicable guideline range "based solely on policy considerations, including disagreements with the Guidelines." *Id.*; *see also United States v. Davey*, 433 Fed. Appx. 343, 348 (6th Cir. 2011) ("Indeed, 'as a general matter, courts may *vary* from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'") (emphasis in original) (quoting *Kimbrough*); *United States v. Brooks*, 628 F.3d 791, 799-800 (6th Cir. 2011) ("a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement.") (emphasis in original).

The "focal point" of sentencing is 18 U.S.C. § 3553(a). *United States v. Foreman*, 436 F.3d 638, 643 (6th Cir. 2006). "A foundational principle of the sentencing procedure established in 18 U.S.C. § 3553 is that the sentence is to be individualized: the judge 'must make an individualized assessment based on the facts presented.'" *United States v. Ferguson*, 518 Fed. Appx. 458, 466 (6th Cir. 2013) (internal citations omitted). Toward that end, district courts "may not presume that the Guidelines range is reasonable" but instead "must make an individualized assessment based on the facts presented." *United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. at 49-50); *see also Pepper v. United States*, 131 S. Ct. 1229, 1223-23 (2012); *United States v. Cole*, 622 F. Supp. 2d 632, 635 (N.D. Ohio 2008). The Sixth Circuit reaffirmed these principles by finding that in adopting the Sentencing Guidelines, "[C]ongress realized that a rigid and inflexible system of mandatory sentences would run the risk

of injustice through insufficient particularity." *United States v. Blanton*, 1990 U.S. App. LEXIS 21544, *9 (6th Cir. Dec. 7, 1990). Accordingly, some variation in sentences based on the particular factual circumstances and characteristics of a defendant "is not only inevitable, but desirable." *Id.*

We offer the following analysis of the relevant sentencing factors that the Court must consider under 18 U.S.C. § 3553(a) in sentencing Vall:

### i.  The Nature And Circumstances Of The Offense—18 U.S.S.C. § 3553(a)(1)

On March 28, 2025, Vall Iliev stood before this Court and accepted responsibility for 1) Conspiracy to Smuggle Goods into the United States, in violation of 18 U.S.C. § 371; 2) Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; and 3) Conspiracy to Traffic in Counterfeit Goods, in violation of 18 U.S.C. § 2320.

The facts surrounding his involvement in these two counts are discussed in both the Information (Dkt., #1) and in Vall's Plea Agreement (Dkt., #11). We do not dispute those facts. But the Court should know that while the Plea Agreement states that the body armor did not pass certification tests, nor were tested per NIJ regulation, there is more to the story. While Vall did not test *each* product batch in accordance with NIJ regulations, he did test *many* batches which were found to be in compliance with NIJ performance standards.[12] Vall did not formally test every batch of body armor due to cost concerns—for instance, in 2023 it cost $11,500 for an NIJ compliant laboratory to test a batch of body armor. However, Vall nonetheless informally tested each single batch before putting it on the market, although his method was not NIJ compliant. His informal testing included enlisting the local police departments and SWAT teams to shoot samples from each batch of body armor that he received from China to see if they worked as anticipated. If any batches failed to meet the NIJ standards or the informal testing conducted by

---

[12] For illustration purposes, *see* Exhibits F, G, H, and I.

-10-

members of law enforcement, he discarded the batches and did not sell the product. For instance, one batch that was formally tested by an NIJ approved laboratory failed to meet NIJ standards[13] and Vall destroyed the entire product order—weighing over 450 lbs.[14]

Vall truly cared about the safety of the law enforcement personnel—he did not simply buy the cheapest body armor from China from unreputable vendors and sell it without performing any testing—he only ordered body armor from Chinese vendors that were listed as NIJ approved vendors. While he admits it was wrong to not formally test the body armor per the NIJ requirements and that he cut corners, he still tested the body armor in light of the cost restraints impacting his business. Importantly, Vall did not greatly profit from this. *See* Dkt. #11, Plea Agreement, at ¶ 23(d). In fact, although his business had sales totaling $10,160,433.70 from 2022-2023,[15] the PSIR fails to mention that his company had a net *loss* of ($595,056.98)[16]. The business was in the red, and owed money to investors.

To be clear, Vall did not create any personal wealth from his offenses. He did it to merely keep his business running, keep employees paid, and earn a decent living. And that was his true motive here. He wasn't trying to peddle an inferior product that he knew would jeopardize the lives of law enforcement personnel. Rather, he was trying to find a less expensive way to keep Vallmar and ShotStop afloat—especially after the pandemic—continue to employ his staff, and return money to his investors.

---

[13] *See* Exhibit J.

[14] *See* Exhibit K.

[15] Dkt. #19, PSIR, at ¶ 19.

[16] *See* Exhibit, L.

Further, Vall did not use any money to fund a lavish lifestyle, like many other white-collar defendants. Vall and his wife still live in the same multifamily home that they lived in since 2001, which they purchased for $133,000. Their modest home, a duplex, is shown in Exhibit M attached herein. In fact, contrary to the PSIR which reflects a total net worth for Vall and his spouse of $621,456.36, in reality their net worth is a *negative* ($270,198.06). Dkt. #19, PSIR, at ¶ 53. Contrary to the PSIR, Vall's financial picture is not as lucrative as portrayed. *See id.* An accurate financial chart is below:

### Assets

#### Vall Iliev:

| | | |
|---|---|---|
| Residence | 4319 & 4323 Lorwood Drive, Stow, Ohio | $ 244,000.00 |
| Personal Checking Account | KeyBank (Vall Iliev Family Trust) | $   15,341.42 |
| Personal Savings Account | KeyBank (Vall Iliev Family Trust) | $     5,000.63 |
| **Total Assets for Vall Iliev** | | $ 264,342.05 |

#### Pepa Iliev (Spouse):

| | | |
|---|---|---|
| Vehicle | 2023 Chevrolet Suburban | $   72,500.00 |
| Personal Savings Account | KeyBank (Pepa Iliev Family Trust) | $   15,464.54 |
| Personal Checking Account | KeyBank (Pepa Iliev) | $   44,656.46 |
| Personal Checking Account | KeyBank (Pepa Iliev Family Trust) x8187 | $   13,761.15 |
| Other Asset Type | KeyBank CD (Pepa Iliev Family Trust) x0542 | $ 153,142.10 |
| Other Asset Type | KeyBank CD (Pepa Iliev Family Trust) x0559 | $ 102,094.73 |
| Stocks | Roth Account | $   23,509.92 |
| **Total Assets for Pepa Iliev** | | $ 425,128.90 |

**Total Combined Assets**
**For Vall Iliev and Pepa**
**Iliev (Spouse)**                                          $  689,470.95


**Liabilities**

| | | |
|---|---|---|
| Mortgage | | $   74,000.00 |
| Vehicle | 2023 Chevrolet Suburban (BFG Federal Credit ) | $   45,478.35 |
| Credit Card | Capital One (Pepa Iliev) | $    1,225.62 |
| Credit Card | Chase (Prime Visa) | $    9,292.28 |
| Credit Card | Capital One | $    1,509.31 |
| Taxes | IRS Owed Taxes for 2023[17] | $  716,072.64 |
| Taxes | Ohio Dept. of Taxation Taxes for 2023 | $  112,090.81 |

**Total Liabilities**                                       $ 959,669.01

**Total Net Worth**                                         $ (270,198.06)

**Monthly Income**

| | |
|---|---|
| Social Security Income | $    3,283.00 |
| Spouse Income | $    3,000.00 |

**Total Monthly Income**                                    $    6,283.00

**Monthly Expenses**

| | | |
|---|---|---|
| Home/Mortgage | 4319 & 4323 Lorwood Drive, Stow, Ohio | $      885.97 |
| Groceries and Supplies | | $    1,600.00 |
| Loan Payment | Car Payment | $      662.00 |
| Gas | | $      140.00 |
| Auto Insurance | Auto-Owners Insurance | $      110.01 |
| Health Insurance | | $      184.00 |
| Homeowner/Renter Insurance | | $      179.00 |
| Medical Expenses | | $       30.00 |

---

[17] *See* Exhibit O.

| Internet Service | Internet and Cable (AT&T & Spectrum) | $ | 188.29 |
| Credit Card Minimum Payments | Capital One | $ | 25.00 |
| Credit Card Minimum Payments | Chase (Prime Visa) | $ | 240.00 |
| Utilities | Electric and Gas | $ | 286.00 |
| Miscellaneous | SpareBox | $ | 269.47 |
| Credit Card Minimum Payments | Capital One (Pepa Iliev) | $ | 25.00 |
| Telephone | US Mobile & Landline | $ | 48.00 |
| Utilities | Water & Sewer | $ | 64.91 |
| Other Expenses | Property Tax | $ | 303.72 |
| Other Expenses | Tax Attorney Fees (Re 2023 Tax Dispute) | $ | 6,250.00 |
| Other Expenses | Lawn Care Services | $ | 130.00 |
| Other Expenses | Snow Plowing Services | $ | 43.75 |
| Other Expenses | Waste Management Services | $ | 26.60 |
| **Total Monthly Expenses** | | $ | 11,691.72 |
| **Total Monthly Cash Flow** | | $ | (5,408.72) |

This chart shows Vall's net worth as *negative* ($270,198.06) and with a *negative* monthly cash flow of ($5,408.72). Dkt. #19, PSIR ¶ 57 incorrectly states that Vall's total income for 2022 and 2023 was "$3,0722,634", as this was due to his accountant inaccurately filing his tax returns and grossly overstating his income. Vall's amended tax returns, attached as Exhibit N, show that his correct adjusted gross income as ($372,275).

But Vall's economic distress is linked to all that he worked so hard to build:  ShotStop is currently in bankruptcy proceedings; Vallmar is no longer a viable business; and Vall, as seen above, is barely surviving. We only bring these points to the Court's attention to dispel the notion that Vall was cutting corners in order to accumulate some vast fortune. He didn't, and he has no cache of money to pay towards restitution.

### ii.     The History and Characteristics of the Defendant—18 U.S.S.C. § 3553(a)(1).

We have spent a substantial portion of this brief providing the Court information about Vall that is not contained in the PSIR. As one court aptly summarized the importance of a defendant's history and characteristics to the 18 U.S.C. § 3553 (a) analysis:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal citation omitted).

Vall's positive contributions to society have not gone unseen. Aside from creating 100 patents in an attempt to better society, he has also helped young engineers in their careers. Vall coached many inventors and helped them bring their inventions to market.

Desperate people often due desperate things.  Yet, the character letters submitted on Vall's behalf show the kind, humble, and hardworking person that Vall has been his whole life. This, coupled with his work to improve society while helping others succeed, should be credited to Vall during his sentencing. Vall is seeking a sentence that allows him to redeem himself and to continue his innovative contributions to society. This Court should be able to fashion a humane sentence, so that Vall can see life after prison.

### iii.     The Need For The Sentence . . . — 18 U.S.S.C. § 3553(a)(2)

Regardless of this Court's sentence, Vall Iliev has already been and continues to be punished for his offense. His wife, Pepa, has seen this first hand, writing, "I know that a severe sentence will have a harmful impact on Vall Iliev's life and well-being. . . [a]t his age and given

-15-

what he and his family has gone through, his health has been in decline, essentially putting himself in prison as of the first day of the lawsuits."[18]

As the result of this investigation and his guilty plea, Vall has lost his reputation as being a highly respected business professional as he is now looked at as a convicted felon. What's worse to him, is he is now viewed as someone who purposely jeopardized the lives of law enforcement, when that is simply *not* the case. Vall has the utmost respect for police officers, SWAT teams, firefighters, and other first responders that keep us safe. That's why he started ShotStop. That's why he offered free lunches to police officers and firefighters twice a week with home cooked meals.[19] He lives with the consequences of his actions every day, and now experiences severe anxiety and depression because of it.

This punishment has hit close to home for Vall too. He worries about assisting his wife, who relies on him for transport as she is unable to drive. With no other family members nearby, he worries about her transportation needs and general mental state being alone. His son has moved away, and no longer speaks to him. He has lost life-long friends. To Vall, these losses are devastating and humiliating, and they haunt him every day and night.

a)  *To Protect the Public and Deter Future Crime—18 U.S.S.C. § 3553(a)(2)(C)*

The United States of America will not be "less safe" if Vall receives minimum incarceration. Based on the fact that these are non-violent offenses, Vall poses a low risk of recidivism, and that deterrence has been accomplished.

---

[18] Correspondence of Pepa Iliev, attached as Exhibit A.

[19] *Id.*

-16-

**1)  Vall's Low Risk of Recidivism**

The Sixth Circuit recognized that a defendant's low risk of recidivism should be weighed against a lengthy prison sentence when it stated:

> An individual with a low risk of recidivism does not need a lengthy incarceration for the protection of the public. The point is underscored in this case where defendant cooperated fully with the authorities, would likely be considered for continued employment even with the guilty plea to this offense, and his treatment providers found him to pose no threat to the public whatsoever.

*United States v. Marshall*, 870 F. Supp. 2d 489, 495 (6th Cir. 2012).

Vall has shown sincere remorse for his conduct, and recidivism is not a concern. He has no criminal history, and his conduct here is an aberration in an otherwise law-abiding and exemplary life he has led for 70 years. *See United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (imposing below-Guidelines sentence based in part on low risk of recidivism); *see also United States v. Smith*, 275 Fed. Appx. 184, 188 (4th Cir. 2008) (finding below-Guidelines sentence appropriate in part because of defendant's low risk of recidivism); *United States v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008) (same).

Any doubt about recidivism should be resolved by considering Vall's age and health concerns. Vall is 70 years old and can barely walk more than a few steps without needing to pause. He uses a cane. He has colorectal cancer, chronic leukocytosis with neutrophilia and mild monocytosis, iron deficiency anemia, hypertension, esophageal reflux, obstructive sleep apnea, high cholesterol, and claudication of both legs. Dkt. #19, PSIR, at ¶ 43. He also suffers from dental problems, namely severe bone loss and ongoing oral infections.

Further, Vall suffers from mental health issues, namely acute stress disorder, severe anxiety, and major depressive disorder. *Id.*, at ¶ 47. Many of these issues began as PTSD, following his escape from Bulgaria, yet have increased in intensity throughout his life. The PTSD,

stress, and depression do not allow Vall to sleep, and he has also been diagnosed with insomnia. Every night, he relies on NyQuil to fall asleep. This case has specifically taken a significant mental toll on Vall. He has always been a man to internalize his thoughts and not burden others with his problems, and he has continued to do so here. This has led to a further decline in his mental health. Imprisoning Vall would only lead to a further, and steeper, decline in his health.

Vall is currently prescribed the following medications to manage his various symptoms, many of which he has to take every two-hours:

- amLODIPine Besylate
- Aspirin
- Ferrous Sulfate
- Lisinopril
- Multivitamin
- NexIUM
- Sildenafil Citrate
- Simvastatin
- Triamterene
- Albuterol Sulfate HFA

These factors, along with the others described above, support a humane sentence. Studies have shown that "recidivism rates decline consistently as age increases," and defendants over the age of fifty display markedly lower rates of recidivism as compared to younger defendants.[20] Courts have recognized this fact as a relevant consideration in sentencing. *See, e.g.*, *United States v. Sabino*, 274 F.3d 1053, 1078-79 (6th Cir. 2001) (upholding downward departure passed in part on defendant's age at the time of sentencing); *United States v. Green*, 2007 U.S. Dist. LEXIS 19557 (S.D. Ohio 2007) ("After *Booker,* district courts have routinely considered a defendant's

---

[20] Government research shows that "Older people are far less likely to commit new crimes." *See* USSG report, The Effects of Aging on Recidivism Among Federal Offenders (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf and United States Sentencing Commission, Measuring Recidivism; The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

age as part of their analysis on the ground that older defendants exhibit markedly lower rates of recidivism compared to younger defendants.") (citations omitted); *United States v. Holden*, 2007 U.S. Dist. LEXIS 42722, *7-8 (E.D. Mich. June 13, 2007) (considering age relevant to defendant's likelihood of recidivism and noting the Sentencing Commission's findings that demonstrate that "people who are employed and those who are over the age of 50 at sentencing are less likely to be recidivists"); *United States v. Coleman*, 370 F. Supp. 2d 661 (S.D. Ohio 2005) (imposing non-incarceration sentence based, in part, on the defendants' ages (59 and 63 years old)).

Vall's health, coupled with the demise of his businesses and reputation, demonstrate that there is no legitimate concern of his behavior here being repeated. Therefore, if the Court determines that a sentence of incarceration is nonetheless appropriate, Vall respectfully requests a minimum sentence, with a recommendation to FMC Lexington—a low security medical facility which can address Vall's infirmity and myriad of debilitating medical conditions.

### 2)  Vall is Not a Threat to the Public

This Court need not be concerned that Vall poses any future risk to the public. The PSIR offers no suggestion that Vall is a threat to others. Until this case, Vall had no previous contact with law enforcement and had lived a law-abiding life. *PSIR*, at ¶¶ 31-36. Vall is a non-violent, first-time offender who has closed his businesses, meaning these crimes are incapable of being repeated.  Further, his medical condition makes it extremely unlikely that he would reoffend.

### 3)  Deterrence Has Already Occurred

Vall's guilty plea has already had the desired deterrence effect as Cleveland-area and national media publications and news services immediately picked up his story. In searching for Vall's name alone, the internet returns dozens of articles of him being charged and pleading guilty to his crimes.

-19-

Even more, Vall continues to face other legal issues relating to his conduct. In April 2025, the Ohio Attorney's General Office sued Vall, ShotStop and Vallmar civilly relating to this case, and he is currently embroiled in a civil lawsuit with a former ShotStop investor.

Vall's reputation has been destroyed by the public humiliation of having his name and guilty plea all over the local and national news, and the point has been made to any business professional contemplating breaking the law. Based on the nationwide exposure of Vall's guilty plea, Shotstop's bankruptcy, and other related lawsuits, the public knows that smuggling and counterfeit crimes will be prosecuted. A prison sentence within the Guidelines is unnecessary as deterrence as already been accomplished.

### D.     The Kind of Sentences Available—18 U.S.S.C. § 3553(a)(3)

#### i.     *The Sentencing Guidelines*

We believe the Government's computation of 26 as Vall's Total Offense Level is accurate. Dkt. #22, Gov. Sent. Mem., p. 6. Further, the PSIR accurately groups Counts 1, 2, and 3 which does not result in a two-level increase for a multiple count adjustment. Dkt. #19, PSIR, at ¶ 3; *see also* PSIR Addendum, Obj. 1.

Vall has a criminal history score of 0, placing him in criminal history category I. Dkt. #19, PSIR, at ¶ 33. The parties have no agreement about the sentence or sentencing range. Dkt. #11, Plea Agreement, at ¶ 15. Each party is free to recommend whatever sentence it believes to be appropriate. *Id*.

Vall's sentencing range under the guidelines suggests a term of imprisonment from 63 to 78 months, a potential fine of up to $5,000,000, and a maximum of three years of supervised release. The calculations under the guidelines, however, ignore the many significant reasons why this duration of incarceration is not the appropriate sentence for Vall.

### ii. Downward Departure Considering Vall's Age and Health

The Court should depart downward in sentencing Vall. The Court is permitted to consider certain characteristics in determining whether a departure from the guidelines is appropriate, such as his age[21], physical condition, mental condition[22], and emotional condition[23]. Vall's age is a permissible departure as he is elderly and infirm, and his health conditions make him susceptible to an inability to secure proper medical care and potential abuse in prison. Further, his health conditions may not be adequately supported in prison, such that his health can decline at a faster rate. Therefore, instead of the Offense Level of 26 imprisonment range of 63-78 months, this Court should consider a more humane sentence.

### iii. Statistics on Excessive Incarceration

Apart from Vall's situation—his age, significant health issues, his innovative contributions to society, his personal and professional history—this Court also should consider more generic issues in fashioning the appropriate sentence. The rising prison population and incarceration rates in the United States are at the top of that generic list.

The Bureau of Justice reported that in 2023, the U.S. prison population increased by 2% from population levels in 2022.[24] The Federal Bureau of Prisons ("BOP")'s capacity projection through Fiscal Year 2024 shows increases in both the population and crowding levels.[25]

---

[21] USSG § 5H1.1.

[22] USSG § 5H1.3.

[23] USSG § 5H1.3.

[24] *See* Prisons Report Series, Preliminary Data Release (Dec. 2024), available at https://bjs.ojp.gov/preliminary-data-release-prisons-2023.

[25] *See* DOJ OIG, The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions, (May 2023), available at https://oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

Particularly, there is a significant increase in crowding for low-security male institutions—*a 9% over capacity forecast for FY 2024*. *Id*. (Emphasis added).

Moreover, this overcrowding problem is compounded when considering Vall's advanced age. Research suggests that it costs twice as much to keep an older person in prison than a younger one.[26]  This has been a challenge for BOP, and it has had to place many offenders on home confinement as a result. From 2020 to 2023, the BOP transferred over 13,666 individuals into home confinement under the CARES Act.[27]

> ### iv.  Lower Imprisonment Range with Community Service is a Significant Sanction.

Community service alone can serve as a significant sanction. Judge John Gleeson of the Eastern District of New York eloquently stated:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, *cost financial institutions, what, $110 million*?
>
> * * *
>
> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. *Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its*

---

[26] *See* Vera Institute of Justice, Aging Out (Dec. 2017), available at https://www.vera.org/downloads/publications/Using-Compassionate-Release-to-Address-the-Growth-of-Aging-and-Infirm-Prison-Populations%E2%80%94Full-Report.pdf.

[27] *See* Dept. of Justice, Statement of Colette S. Peters (2023), available at https://www.bop.gov/resources/news/pdfs/testimony-20231107.pdf.

> *nature, given your age and your physical circumstances.* I don't
> think the goals of sentencing here require you to be incarcerated.

*United States v. Shamilzadeh*, No. 04-CR-1094 (JG), (E.D.N.Y April 1, 2008) (emphasis added).

If the Court were to consider a minimum imprisonment range, with a sentence of probation, this would be significantly punitive and deterrent. In *Myers*, the court stated, "[T]he sentence supervised release in this case 'is not an act of leniency * * * , but is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F.Supp.2d 1026, 1032 (S.D. Iowa 2005).

### v. A Sentence of Minimum Incarceration With Home Confinement

U.S.S.G. § 5H1.1 specifically states that home confinement is a "form of punishment" and it may be considered for elderly defendants where it may be "equally efficient as and less costly than incarceration." Moreover, U.S.S.G. § 5H1.4 specifically permits the Court to consider a defendant's "Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

In the event the Court feels compelled to provide a more stringent sentence, these facts, coupled with the data from the BOP related to the elderly inmates, should enable the Court to fashion a human sentence that accounts for Vall's many medical issues.

**E.  The Need To Avoid Unwanted Sentencing Disparities Among Defendants with Similar Records—18 U.S.C. § 3553(a)(6)**

The PSIR appreciates the uniqueness of Vall's case and identified the following grounds for a downward variance from the applicable sentencing guidelines:  "The defendant's lack of criminal history, physical health condition and sentencing disparities" PSIR, at ¶ 88. A variance for Vall's health and age is further supported by case law. *See*, *e.g.*, *United States v. McFarlin*, 535 F.3d 808, 810–12 (8th Cir. 2008) (variance to a sentence of probation was warranted in part based on the defendant's "poor health" and "need for medical care"); *United States v. Myers*, 503 F.3d 676, 687 (8th Cir. 2007) ("The district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence.").

Further, 18 U.S.C. § 3553(a) mandates the Court to "consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." PSIR, at ¶ 88. The PSIR cites statistical data showing that during the last five years, defendants with an Offense Level of 27 and a Criminal History of 1, received an *average* and *median* length of 41 months imprisonment. *Id.* (emphasis added). This is further support for this Court to not to blindly follow a guidelines range, and instead consider a downward variance from the Guidelines.

**F.  The Need to Provide Restitution to Any Victims of the Offense**

Vall's plea agreement requires him to make restitution, and he is dedicated to starting that process. However, he will not be able to repay restitution if he is sentenced to long-term of imprisonment. It is in the victims' best interest to allow Vall to continue his innovative work—outside of prison—so that he can pay any restitution that he can.

IV.     **CONCLUSION**

Throughout this memorandum, we have repeatedly asked this Court to impose a humane sentence. A below the Guidelines sentence would benefit the victims and society by allowing Vall to put his talent to work and, hopefully, repay restitution. Accordingly, we respectfully ask this Court to sentence Vall to a sentence "sufficient, but not greater than necessary" to meet the goals of sentencing.

Respectfully submitted,

*/s/ Mira Aftim*
John R. Mitchell (0066759)
Mira Aftim (0097754)
TAFT, STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114
P: (216) 241-2838
F: (216) 241-3707
jmitchell@taftlaw.com
maftim@taftlaw.com

*Attorneys for Defendant Vall Iliev and*
*Vallmar Studios, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the forgoing *Sentencing Memorandum* has been forwarded by operation of this Court's electronic filing system this 1st day of July 2025 to all parties.

*/s/ Mira Aftim*_____
Mira Aftim (0097754)
